STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-1109 consolidated with 14-1114

MEYER & ASSOCIATES, INC.

VERSUS

THE COUSHATTA TRIBE OF LOUISIANA

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2006-2683
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Jimmie C. Peters, Billy Howard Ezell, and Phyllis M. Keaty, Judges.

**JUDGMENTS REVERSED; VACATED; AND REMANDED.**

Steven J. Dupuis
P. O. Box 4425
Lafayette, LA 70502-4425
(337) 233-6070
COUNSEL FOR DEFENDANT/APPELLANT:
    The Coushatta Tribe of Louisiana

**Charles D. Elliott**
**Vilar & Elliott, L.L.C.**
**P. O. Box 12730**
**Alexandria, LA 71315-2730**
**(318) 442-9533**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**The Coushatta Tribe of Louisiana**

**Michael Reese Davis**
**Hymel Davis & Peterson, L.L.C.**
**10602 Coursey Boulavard**
**Baton Rouge, LA 70816**
**(225)298-8118**
**COUNSEL FOR PLAINTIFFS/APPELLEES:.**
**Meyer & Associates, Inc.**
**Richard T. Meyer**

**PETERS, J.**

In these consolidated appeals, the Coushatta Tribe of Louisiana appeals a number of trial court judgments which had the ultimate effect of awarding Meyer & Associates, Inc. $10,998,250.00 in contractual damages, $5,585,573.00 in attorney fees, and $57,662.34 in court costs. Meyer & Associates, Inc. answered the appeal seeking a $1,902,339.65 increase in the damage award. For the following reasons, we reverse the trial court's judgments on certain summary judgment issues, vacate the trial court judgments on the merits, and remand the matter to the trial court for further proceedings.

## DISCUSSION OF THE RECORD

The Coushatta Tribe of Louisiana (hereinafter sometimes referred to as "the Tribe" or "CTOL"[1]) is a federally recognized Indian tribe governed by an elected four-member Tribal Council and a separately elected Tribal Council Chairperson. The Tribe operates its governmental and business activities from its offices in Allen Parish, Louisiana. Meyer & Associates, Inc. (hereinafter sometimes referred to as "Meyer & Associates" or "the engineering firm") is a Louisiana corporation formed to provide professional engineering services to its clients. Its offices are located in Calcasieu Parish, Louisiana.

In July of 2001,[2] the Tribe and Meyer & Associates entered into a twenty-seven page contract (hereinafter referred to as the "original contract" or the "General Agreement") wherein the engineering firm agreed to provide consulting services to the Tribe relating to its ongoing capital improvement project at its casino facility located in Kinder, Louisiana. The issues in these consolidated

---

[1] CTOL is the abbreviation used in most of the contract documents entered into evidence at the various stages of the litigation.

[2] While the contract itself does not contain a date of execution, attachments to the contract establish the effective date as July 20, 2001.

appeals originate from subsequent modifications made to that General Agreement.

In early 2002, members of the Tribal Council and Richard Meyer, the engineering firm's vice president, began preliminary discussions concerning the possibility of designing and constructing a facility to generate electrical power to service the needs of the casino, the individual members of the Tribe, and potential customers on the open market. To that end, and because Meyer & Associates had no experience or in-house expertise in developing or implementing such a project, Mr. Meyer began assembling a team of experts (hereinafter sometimes referred to as the "project team" or "team") to join with the engineering firm and the Tribe in pursuing this new goal.

The project team began exploring the possibilities of developing an electrical power program; and in May of 2002, the team circulated its preliminary findings to the Tribal Council in the form of a Concept Stage Benchmark Feasibility Study (Feasibility Study). Over the next six months, the team continued to assess, update, and modify its initial findings; and at the Tribal Council's December 17, 2002 meeting, Mr. Meyer presented an updated version of the original Feasibility Study for the Tribal Council to consider. This presentation led to the Tribal Council, at its January 14, 2003 meeting, unanimously adopting a formal resolution (hereinafter referred to as "the Resolution") authorizing the development of an electrical power program.[3] Among other things, the eight-page Resolution authorized "[t]he Chairman of the CTOL Tribal Council or his Designee . . . to negotiate and execute . . . all necessary additional Agreements with Meyer and/or to execute Work Authorizations either under the existing General

---

[3] A draft of the Resolution had been provided to the Tribal Council by Mr. Meyer at the December 17, 2002 meeting. When enacted at the January 2003 meeting, it was identified as Tribal Council Resolution No. 2003-04 and bore the title "AUTHORIZATION TO DEVELOP AND IMPLEMENT A COUSHATTA TRIBE OF LOUISIANA POWER PROGRAM[.]"

Agreement or any additional Agreement with Meyer to provide" the services required for the completion of the project. As a special condition, the Resolution limited the Tribe's financial obligation in the preliminary phase of the project to $3,375,000.00 and its financial obligation in the project as a whole to an additional $10,000,000.00.

The Resolution further provided that upon the completion of Phase 2 activities, "[t]he CTOL reserves all rights at the time of review to agree to a projected return on investment and to proceed with Phase 3 Program Activity or to modify the Program to achieve the investment return desired or to stop project activity and not execute any final agreements." To emphasize this safeguard, the Resolution provided that "[t]his statement shall be included in all appropriate agreements authorized under this resolution."

As an additional special condition, the Resolution (parenthetical omitted) provided that "[a]ll agreements to be executed by the CTOL shall include appropriate and reasonable Termination Provisions that are generally consistent with the Standards of the Power Industry for Development Programs of this type." The Resolution contained the signatures of Lovelin Poncho as Chairman; William Worfel as Vice Chairman; Bertney Langley as Secretary-Treasurer; and Leonard Battise and Harold John as Tribal Council Members.

Chairman Poncho represented the Tribe and Mr. Meyer represented the engineering firm in the initial subsequent negotiations. Their efforts resulted in the execution of a nine-page interim supplemental agreement (hereinafter referred to as the "Interim Agreement") which modified the General Agreement to include the electrical power project. This Interim Agreement had an effective date of January

14, 2003;[4] incorporated the specifics of the General Agreement "except as amended, supplemented, or clarified" in the Interim Agreement; set forth the obligations of the respective parties with respect to an early termination of the project; and provided that the electrical power project would be developed in five phases:

- Phase 1 – Initial Benchmark Study[5]
- Phase 2 – Preliminary Phase Services
- Phase 3 – Engineer/Procure/Construct (EPC Phase)
- Phase 4 – Commissioning Phase (Start-up)
- Phase 5 – Management and Operation Phase

Language in the Interim Agreement made it clear that the parties contemplated executing a definite final agreement for Phases 3, 4, and 5 before work was completed on Phase 2. At the same time, it provided that until the parties reached a final agreement, the Interim Agreement and/or Work Authorizations arising under the Interim Agreement would bind the parties and govern the project. The Interim Agreement further provided that in the event a subsequent final agreement was never executed, it would become the final agreement binding on all parties; and that the terms of Work Authorizations issued pursuant to the General Agreement or Interim Agreement would have the effect of amending the terms of the agreements in place at the time the Work Authorizations were issued. In fact, the parties attached the first of what would ultimately be three Work Authorizations to the Interim Agreement.

Among many other conditions and provisions, the Interim Agreement also provided that its contents would be "governed and construed under the laws of the State of Louisiana[,]" that "any dispute arising [under it] shall be heard by a court

---

[4] The document does not reference the date of execution, but the effective date corresponds to the date of passage of the Resolution.

[5] This phase was already complete when the Interim Agreement was entered into.

of competent jurisdiction in the Parish of Allen, or any other Parish mutually agreed to," and that the Tribe specifically waived sovereign immunity.

The termination provisions are found in Section 1.3 of the Interim Agreement and read as follows:

> Should CTOL after initiation of Phase 3 Services based upon binding and executed Power Sales Agreements which are sufficient for reasonable project funding, for any reason, sells or leases the facility or while it is considered construction in progress to any third party, Meyer shall be entitled to a commission of six (6) percent of gross sales price or capital lease price based upon a 20 year term for the plant facility or under construction. In the event CTOL elects to terminate the project or Meyer services during Development Plan Phase 2 a termination fee equal to one-half the remaining Phase 2 Lump Sum agreement amount after billing and payment of all billed and unbilled work in progress shall be due and payable to Meyer and shall be paid upon said termination. In the event Phase 2 Services are terminated prior to June 15, 2003, Meyer shall be paid no less than $1,490,000 and the total cost for Phase 2 Services at June 15, 2003, shall not exceed $1,490,000 with any unpaid amount due at termination provided overall amount paid to Meyer does not exceed $1,490,000. In the event that CTOL decides to terminate the project or Meyer services after binding Power Sales Agreements deemed sufficient to permit normal project financing for power plants have been executed by the Power Takers identified in CTOL Resolution 2003-4 and/or equivalent bonafide Power Takers, CTOL shall fully compensate Meyer in the amount defined herein at Article 1.7.2 for Developer Services plus all reimbursable expenses.

Chairman Poncho and Mr. Meyer executed the one-page Work Authorization attached to the Interim Agreement (hereinafter referred to as "WA#1"). WA#1 had an effective date of January 14, 2003,[6] and among other matters, set the initial scope of service as that of providing "'Preliminary Phase Services' for the CTOL Power Program." Additionally, it set Meyer & Associates' total compensation for these Phase 2 services at $3,375,000.00;[7] and provided that because time was considered to be of the essence in the Interim Agreement

---

[6] WA#1 bears no date of execution, but the effective date is the same date as the Interim Agreement to which it was attached.

[7] This was broken down into $3,206,250.00 for professional services and $168,750.00 for reimbursable expenses.

because of the timelines associated with the power purchase agreements, Meyer & Associates proposed "to complete Preliminary Phase Services as quickly as possible but not to exceed a period of seven months." WA#1 made no mention of the termination provisions contained in the Interim Agreement.

The second Work Authorization (WA#2), executed by Mr. Worfel and Mr. Meyer, became effective on May 1, 2004.[8] Among other things, WA#2 significantly changed the scope of services to be performed in Phase 2 by the following:

> This WA combines the scope of Phase 2 Part 1 Initial Preliminary Services Work with added Part 2 Work to provide a WA for Phase 2 Part 1 and Part 2 Services. The Scope of Services of the prior Work Authorization issued for Phase 2 Initial Preliminary Services for the Power Project is hereby replaced in its entirety with this Work Authorization and this authorization includes the Initial Part 1 Services and provides expanded and extended Phase 2 Services to include Supplemental Phase 2 Services (designated as Phase 2 Part 2) for the Louisiana Energy & Power Authority's (LEPA) and Other Off-Takers Blended Plant Alternative Approach under the Phase 2 Part 2 Scope.

WA#2 also revisited the issue of compensation to the engineering firm by increasing the maximum amount to be paid to it for Phase 2 services from $3,375,000.00 to $13,375,000.00. Additionally, it raised the termination fee to 95% of the remaining unbilled fees authorized by all active work authorizations, as well as all reimbursable expenses and a penalty equal to one third of the Developer Services Compensation based on a 400 megawatt basis or $5,440,000.00.

In March of 2005, three members of the Tribal Council acted favorably on the following five resolutions, which are summarized as follows:

> **Resolution No. 2005-A:** This resolution affirmed Chairman Poncho's designation of William Worfel as the individual to represent the Tribe in negotiations with Meyer & Associates on the CTOL

---

[8] WA#2 does not contain a signature date.

6

Power Program; and recognized that the actual designation of Mr. Worfel by Chairman Poncho had been in effect since October 1, 2003.

**Resolution No. 2005-B:** This resolution authorized the creation of the Coushatta Energy Development Company, LLC based on the recommendation of "Special Project Legal Advisors and Financial Advisor[.]" It further authorized the assignment of all power project contracts to the LLC and provided that the first board of directors would be comprised of Chairman Lovelin Poncho, Vice Chairman Leonard Battise, and Secretary-Treasurer William Worfel.

**Resolution No. 2005-C:** This resolution delegated all the authority and control over the CTOL Power Program vested in the Tribe by Tribal Council Resolution 2003-04 to the not-yet-formed Coushatta Energy Development Company, LLC.

**Resolution No. 2005-D:** This resolution authorized significant amendments of the corporate charter of Coushatta Empire, Inc. to effect the development of the power project. Coushatta Empire, Inc., according to the resolution, is the Tribe's federal charter of incorporation, and one of the changes sought included the transfer of the authority within the corporation from the shareholders to the Tribal Council.

**Resolution No. 2005-E:** This resolution authorized the Coushatta Development Company, LLC to "fully pursue the complete evaluation, development and implementation of various economic development projects" for the Tribe, including specifically the energy project; and provided the LLC with expansive powers to effect the development of any project.

At approximately the same time these resolutions were being acted on, Mr. Worfel and Mr. Meyer executed the third and final Work Authorization (WA#3), with an effective date of April 1, 2005. This six-page final Work Authorization took effect in the face of the upcoming Tribal Council election and slightly more than two months before the entire project completely unraveled. WA#3 began by ratifying and incorporating that which had been set out in the previous resolutions and contractual documents executed between the parties, including particularly WA#2. This final Work Authorization also referenced the six resolutions enacted

by the Tribe,[9] and with regard to those resolutions, stated the following:

> As stated above, it is fully understood and agreed between CTOL and [the engineering firm] that the above listed CTOL Resolutions are integral to the successful implementation of the CTOL Power Program and for the effective completion of Development Plan Phase 2 Preliminary Services by [the engineering firm] *and any adverse action taken by the CTOL, CTOL Tribal Council or Others on behalf of the CTOL Tribal Council to either rescind or interfere with the full implementation of the provisions the resolutions granted or fail to fully and in good faith take all steps required by such resolutions shall be considered to be termination action by the CTOL and the Tribal Council to terminate the CTOL Power Program and/or* [*the engineering firm's*] *services on said program.* Such termination action by CTOL shall result in the payment of the Termination Fees and Assignments as presented at SC17 of Work Authorization No. 2 (WA#2) which is part of the Prior Work Authorizations of Attachment No. 1 hereto.

(Emphasis added.)

WA#3 also addressed the confidentiality of certain financial information being shared between the Tribe and the engineering firm and ended that discussion with the comment that:

> Any breach of the Confidential Requirements by either the CTOL or the [engineering firm] by releasing any such Project Budget Data including specific RFP payment amounts to [the engineering firm] and Others by the CTOL to any party either private or public shall constitute breach of the Confidentiality Agreement and shall be interpreted to be a termination action of the Project or [the engineering firm] and all remedies available under SC17 of WA#2 and SC9 of WA#3 shall full[y] apply.[10]

Additionally, WA#3 increased the termination fee due Meyer & Associates with the following language:

> Termination shall be in accordance with Article SC17 and shall also be in accordance with Other Articles of WA#2 including specific additional provisions as defined with respect to Termination at SC Articles SC8, SC16, and SC18 of WA#2 and the Special Legal Counsel Article at SSSWA#2 as provided at Attachment No. 1 hereto

---

[9] These were Resolution No. 2003-04 and the five resolutions enacted in March of 2005.

[10] SC17 of WA#2 is the termination provision of that Work Authorization, and SC9 of WA#3 is the termination provision of that Work Authorization, which attempts to amend and modify WA#2.

8

and to include Article SC2 and Article SC8 herein. The result of termination as provided for at the cited SC Articles includes at minimum, 1) Termination Fee Payments cited including the amendment herein below; 2) Assignment of all Agreements and Contracts with all Parties to the [engineering firm]; and 3) Assignment of all Work Products of the [engineering firm] to the [engineering firm].

Article SC17 of WA#2 is hereby amended to change the words which now read "an additional amount equal to one-third (1/3) of the Developer Services Compensation" to read as follows "an additional amount equal to one-half (½) of the Developer Services Compensation". This change being made due to the development changes incurred since the Effective Date of May 1, 2004 for WA#2 versus the Effective Date of April 1, 2005 for WA#3.

WA#3 made no changes to the previous agreement that any disputes arising between the Tribe and the engineering firm would be governed by Louisiana law, but did make a significant change to the venue provision of the previous agreements. Both the Interim Agreement and WA#2 provided that the venue for any disputes between the parties would be "the Parish of Allen, or any other Parish mutually agreed to[.]" However, WA#3 amended the language found in WA#2 to read "'that any dispute arising hereunder shall be heard by the Fourteenth Judicial District Court, State of Louisiana[.]'" This language gave Meyer & Associates the benefit of litigating any dispute in its home parish, the location of the Fourteenth Judicial District Court, and is the reason this litigation was filed in Calcasieu Parish rather than in Allen Parish as previously contemplated.

The parties never executed a definitive final agreement, and this litigation arises because a tribal election in the Spring of 2005 resulted in the election of three new individuals to office, including a new Council Chairman.[11] The election of these three individuals established a new majority in the Tribal Council, and this majority expressed concerns over the expenditure of tribal funds in numerous

---

[11] The election removed Chairman Poncho, Mr. Battise, and Mr. Worfel as members of the Tribal Council.

9

projects sanctioned by the former administration, including the electrical power project. During the newly instituted Tribal Council's first meeting in June of 2005, newly-elected Tribal Chairman Kevin Sickey requested that the Tribal Council suspend the electrical power project pending further investigation of the matter, and the Tribal Council complied with this request. When efforts to resolve the issues and move the project forward failed, Meyer & Associates filed the breach of contract suit now before us. In its June 9, 2006 filing, the engineering firm sought a judgment against the Tribe for damages, attorney fees, and costs of the litigation.

The Tribe responded to Meyer & Associates' original petition on July 7, 2006, by filing declinatory exceptions of lis pendens and lack of subject matter jurisdiction.[12] The trial court rejected these exceptions, and the Tribe's subsequent efforts to reverse that decision were rejected by the Louisiana Supreme Court and, ultimately the United States Supreme Court. *Meyer & Assocs., Inc. v. Coushatta Tribe of La.*, 07-2256 (La. 9/23/08), 992 So.2d 446,[13] *cert. denied, Meyer & Assocs., Inc. v. Coushatta Tribe of La.*, 556 U.S. 1166, 129 S.Ct. 1908 (2009).

Resolution of the jurisdictional issues delayed the litigants proceeding with the state trial court proceeding for almost three years, but with jurisdiction firmly established in the trial court, matters began moving forward on May 7, 2009, when the Tribe answered the petition of Meyer & Associates and filed a reconventional

---

[12] The Tribe based its lis pendens exception on the fact that the Tribe had filed suit against Mr. Meyer and Meyer & Associates in its own Tribal Court on April 26, 2006; and based its subject matter jurisdiction exception on the sovereign immunity afforded to recognized Indian tribes by the United States Government.

[13] In doing so, the supreme court reversed this court, which had applied the Federal Exhaustion of Tribal Remedies Doctrine and stayed the trial court suit until the Tribal Court could render a judgment addressing the waiver of sovereign immunity issue. *Meyer & Assocs.*, 992 So.2d 446.

10

demand against both the engineering firm and Mr. Meyer.[14] In its pleading, the Tribe answered the allegations of the petition; set forth a number of affirmative defenses; and reconvened against Meyer & Associates and Mr. Meyer asserting breach of contract, breach of fiduciary duties, and failure to provide the Tribe with an appropriate accounting. By way of relief, the Tribe sought to have a number of Tribal Council resolutions[15] and the agreements arising therefrom declared to be null; a finding of breach of contract and breach of fiduciary duties; an accounting of all funds received and spent in the power project; and damages.

Meyer & Associates and Mr. Meyer responded to the Tribe's reconventional demand in separate filings on June 1, 2009, and in separate ways. Meyer & Associates filed an answer directly addressing the assertions in the reconventional demand, and Mr. Meyer filed exceptions of no right of action, insufficiency of citation, and improper cumulation of actions. From this point forward, the trial court record expanded exponentially, with both sides filing multiple pleadings, memoranda, and exhibits.

By a supplemental and amending pleading filed on March 26, 2010, the Tribe added the assertion of fraud as both an affirmative defense and as a claim under the reconventional demand. A second supplemental and amending pleading filed by the Tribe on February 19, 2013, added error, mistake, estoppel, extinguishment of the obligation, and the Tribe's sovereign immunity as additional affirmative defenses.

The first of a series of exceptions and motions for summary judgment began to be filed by the litigants in 2012. These can be summarized as follows:

---

[14] At this point in the litigation, Mr. Meyer had not been joined as an individual party to the litigation. However, La.Code Civ.P. art. 1064 provides that "[p]ersons other than those made parties to the original action may be made parties to the reconventional demand."

[15] Resolution No. 2003-04 and Resolutions No. 2005-A, B, C, D, and E.

11

**PRELIMINARY MOTIONS AND FILINGS ADDRESSING THE TRIBE'S CLAIMS OF FRAUD AND MISREPRESENTATION:**

**September 12, 2012:**  A motion for partial summary judgment filed by Meyer & Associates seeking dismissal of the fraud claims asserted against it by the Tribe.  Made a part of the motion are three exhibits with thirty-four attachments.

**November 19, 2012:**  A cross motion for partial summary judgment filed by the Tribe seeking judgment on the claims of fraud asserted against Meyer & Associates (couched in terms of misrepresentation, omissions, and suppression of the truth).  Made a part of the cross-motion are three exhibits with twenty-six attachments.

**November 21, 2012:**  The Tribe's opposition to Meyer & Associates' partial summary judgment motion addressing the fraud allegations.  Made a part of the opposition are fifteen exhibits with twenty-six attachments to the first exhibit of the fifteen.

**PRELIMINARY MOTIONS AND FILINGS ADDRESSING MEYER & ASSOCIATES' CLAIMS FOR UNPAID EXPENSES:**

**October 11, 2012:**  A motion for partial summary judgment filed by Meyer & Associates seeking a judgment recognizing its right to recover contractual expenses.  Made a part of the motion is one exhibit with forty-eight attachments.

**November 21, 2012:**  The Tribe's opposition to Meyer & Associates' partial summary judgment motion addressing the expenses allegations.  Made a part of the opposition are two exhibits with one attachment to the first exhibit.

**September 11, 2013:**  Meyer & Associates' reply to the Tribe's opposition to its partial summary judgment motion addressing the expense allegations.  Made a part of the reply are five exhibits.

**PRELIMINARY MOTIONS AND FILINGS ADDRESSING THE ISSUES OF JOINT VENTURE, AGENCY, MANDATARY, AND FIDUCIARY DUTIES:**

**November 19, 2012:**  A motion for partial summary judgment filed by the Tribe seeking a judgment establishing that the legal relationship created by the various agreements between the parties is that of a joint venture, and that this relationship created a fiduciary relationship.  Made a part of the motion are ten exhibits with twenty-six attachments to the first exhibit.

**August 30, 2013:**  A cross motion for summary judgment filed by Meyer & Associates seeking a judgment recognizing the joint venture relationship and the recognition that the Tribe owed fiduciary duties,

not only to Meyer & Associates, but to the project team members as well. Made a part of this cross motion are two exhibits.

**September 9, 2013:** The Tribe's opposition to Meyer & Associates' cross motion for summary judgment on these issues. Made a part of this opposition are ten exhibits with twenty-six attachments to the first exhibit.

**September 11, 2013:** Meyer & Associates' response to the Tribe's opposition to the cross motion for summary judgment. This response contained no exhibits or attachments.

## PRELIMINARY MOTIONS AND FILINGS ADDRESSING BREACH OF CONTRACT:

**August 30, 2013:** A motion for summary judgment filed by Meyer & Associates seeking a judgment to the effect that the Tribe breached its contractual obligations and that Meyer & Associates is entitled to stipulated damages. Made a part of the motion are eight exhibits with fifty-three attachments.

**September 9, 2013:** The Tribe's opposition to Meyer & Associates' motion for summary judgment on these issues. Made a part of the motion are nineteen exhibits.

## EXCEPTIONS FILED BY THE TRIBE:

**August 30, 2013:** Exceptions of no cause and no right of action addressing the validity of the termination fee relied on by Meyer & Associates in seeking a damage award. Made a part of the exceptions is one exhibit.

**August 30, 2013:** Exception of prescription asserting that the expense claims of Meyer & Associates are in the nature of open account claims and, therefore, have prescribed. Made a part of this exception is one exhibit.

## EXCEPTIONS FILED BY MEYER & ASSOCIATES:

**August 30, 2013:** Exception of prescription addressing the Tribe's claims of fraud and breach of fiduciary duties raised in the reconventional demand. Made a part of this exception are two exhibits.

**September 9, 2013:** The Tribe's opposition to Meyer & Associates' exception of prescription. Made a part of this opposition are eight exhibits.

**September 11, 2013:** Meyer & Associates' reply to the Tribe's opposition to its exception of prescription. Made a part of this reply is one exhibit.

The disposition of these filings comprise an integral part of the issues now before us, and in response to the buildup of these preliminary matters, the trial court held a hearing on September 13, 2013, wherein it attempted to address all of the pending motions and exceptions. At the end of the hearing, the trial court orally ruled that all claims by the Tribe in its reconventional demand for fraud had prescribed, but that its affirmative defense of fraud remained viable; that its claim for negligent breach of fiduciary duty had prescribed, but that its claim for intentional breach of fiduciary duty remained viable; and that the engineering firm's claim for reimbursement of expenses had not prescribed. However, the trial court did not immediately execute a written judgment on these rulings, and all of the remaining issues before the court were either stipulated to or taken under advisement.

On the issues of agency and joint venture, the trial court orally issued a ruling wherein the motions were granted in part and denied in part. The trial court recognized the Tribe, Meyer & Associates, and members of the project team as participants in a joint venture and that each owed a fiduciary duty to the other, but did not reach the Tribe's claim in its motion for summary judgment that Meyer & Associates breached a fiduciary duty. For oral reasons assigned, the trial court also denied the Tribe's peremptory exception of prescription.

On September 24, 2013, the trial court issued a written ruling entitled "**RULING ON MOTION FOR SUMMARY JUDGMENT, MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION TO DEEM FACTS ADMITTED AND TO COMPEL RESPONSES TO REQUEST FOR**

14

**PRODUCTION**" wherein it addressed some of the remaining issues raised at the

September 13, 2013 hearing. In addressing these issues, the trial court stated the

following:

> Meyer's Motion for Summary Judgment seeks a ruling that the CTOL breached its contract with Meyer and that Meyer is owed stipulated damages in the amount of $12,902,339.65 plus interest from June 8, 2005 along with costs and attorneys' fees. For the following reasons, the Court grants limited relief to Meyer.

> The preliminary issue is whether Meyer misrepresented the feasibility of the power program to the extent that the CTOL was, in essence, "tricked" into entering a contract with Meyer that had no chance of success. The CTOL relies on the opinion testimony of Dr. Tabors to argue that the program proposal was flawed and its chance of success overstated by Meyer. Meyer counters with its expert's opinion that the program proposal was, and is, feasible and defensible.

> The Court finds that the agreement entered into between the CTOL and Meyer on January 14, 2003 to initiate the CTOL power program was an arms-length transaction in which Meyer reasonably identified the potential risks to the CTOL. More importantly, there is no genuine issue of material fact that Meyer made misrepresentations or omission of facts to the CTOL at this stage of the program. The CTOL knew that Meyer had no specific experience in the field, but they trusted Richard Meyer to assemble a team of competent professionals with acceptable experience, which he did. The feasibility study outlined the pros and cons of the program and the CTOL had every opportunity to ask questions and consider the proposal before making its decision, which it did to its apparent satisfaction.

> There are genuine issues of material fact regarding the work authorizations entered into between the CTOL and Meyer subsequent to the interim agreement of January 14, 2003 and whether Meyer breached its fiduciary duty owed to the Tribe, specifically on the issue of Meyer's compensation and the CTOL's exposure under the contract. Likewise, and because the issue is part of the aforementioned work authorizations, the Motion for Partial Summary Judgment regarding expenses filed by Meyer is denied. These matters that [sic] will go to the jury unless the parties provide the Court with authority that these are legal issues to be decided by the Court. The Court will consider such authority and arguments at the pre-trial conference.

> For the reasons outlined in Meyer's memorandum, the Court orders that Request for Admissions 17, 18 and 19 in the 2009

15

discovery submitted by Meyer to CTOL be deemed admitted.[16] The Court orders CTOL to respond with definitive admissions or denials to Meyer's 2013 Requests for Admission and that CTOL produce all documents requested in Meyer's 2013 Request for Production. The Court orders attorneys' fees against CTOL in the amount of $2,500.00 for its failure to respond appropriately to discovery and to this Court's prior orders regarding this discovery.

This language is followed by a line which states that the ruling was "[r]endered in Chambers" on September 24, 2013, and with a signature line for the trial court. Although the signature line bears a signature, it carries the notation "for" in front of the signature.[17]

On September 27, 2013, the trial court executed and filed eleven written judgments addressing some of the issues orally ruled on at the September 13, 2013 hearing. Of the eleven, four are pertinent to the issues now before the court. The first relates to the fiduciary duty issues and reads in pertinent part as follows:

> This matter came before the Court on September 13, 2013 on Defendant's *Motion for Partial Summary Judgment (Agent, Mandatary, Fiduciary)* and Plaintiff's *Cross-Motion for Partial Summary Judgment RE: Agency and Joint Venture.*
>
> . . . .
>
> **IT IS ORDERED, ADJUDGED, AND DECREED** that both Motions are **GRANTED IN PART** to recognize that the Coushatta Tribe of Louisiana, Meyer & Associates, Inc., Louisiana Power Group, the Shaw Group, and the other Team Specialists were joint venturers in the Power Program, who owed reciprocal fiduciary duties to each other; otherwise, the motions are **DENIED IN PART.**
>
> **JUDGMENT RENDERED** in Open Court on the 13th day of September, 2013.
>
> **JUDGMENT READ AND SIGNED** this 27 day of Sept., 2013, in Lake Charles, Louisiana.

---

[16] The requests for admissions that were deemed admitted relate to the fact that all of the then Tribal Council members were at the December 23, 2002 and January 14, 2003 Tribal Council meetings, and that all of those present voted for the Resolution at the latter meeting.

[17] We construe this to mean that someone other than the trial court wrote the trial court's name on this line.

Another of the eleven judgments addressed the Tribe's exception of prescription on the expenses issue,[18] and yet another addressed the engineering firm's exception of prescription on the fraud claims. This latter judgment reads in pertinent part as follows:

> This matter came before the Court on September 13, 2013 on Plaintiff's *Peremptory of* [sic] *Exception of Prescription.*
>
> . . . .
>
> **IT IS ORDERED, ADJUDGED, AND DECREED** that the Peremptory Exception of Prescription is **GRANTED** as to all of the Coushatta Tribe of Louisiana's fraud claims and causes of action, including delictual and contractual, asserted in Defendant's Reconventional Demands.
>
> **JUDGMENT RENDERED** in Open Court on the 13th day of September, 2013.
>
> **JUDGMENT READ AND SIGNED** this <u>27</u> day of <u>Sept.</u>, 2013, in Lake Charles, Louisiana.

Before the trial court executed a written judgment on any of the other oral rulings issued on September 13, 2013, or on the rulings expressed in the written reasons of September 24, 2013, the parties participated in an October 3, 2013 pretrial conference in anticipation of the trial on the merits scheduled for October 15, 2013.[19] At that pretrial conference, the trial court announced that it had revised the September 24, 2013 reasons, and produced new written reasons for judgment dated that same day, entitled "**RULING ON ISSUES OF BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY AND STIPULATED DAMAGES**[.]" In these new reasons, the trial court stated:

> Pursuant to discussion with counsel at the pretrial conference on October 3, 2013, and after further review of the pleadings, exhibits,

---

[18] This issue is not before us on appeal.

[19] While we find no specific order assigning the matter for trial on October 15, 2013, correspondence in the record dating back to the latter part of 2012, indicates that an October 15, 2013 trial date had been set by the trial court.

17

memoranda and arguments of counsel, the Court issues the following revised ruling.

There exists no genuine issue of material fact but that the Tribe breached the Power Project contract by, among other things, halting all Richard Meyer projects at its June 14, 2005 council meeting; cancelling a June 29-30, 2005 meeting of involved parties; terminating Worfel as the Tribe's authorized representative, announcing to Tribe members in a written communication of September 17, 2005 that the Power Project was "suspicious" and heavily criticizing past dealings with Richard Meyer; and suing Meyer in Tribal Court for an accounting in 2006. Some [of] these acts individually would be breaches. Viewed as a whole, it is undeniable that after the election of a new council in June of 2005, the council, and thus the Tribe, had no intention of proceeding with the Power Project or with Meyer & Associates in any fashion.

The Court has reconsidered the issue of Meyer's alleged breach of fiduciary duty to the Tribe. For the same reasons previously given to grant summary judgment in favor of Meyer on the issue of fraud, the Court now grants summary judgment in favor of Meyer dismissing the Tribe's claim based on breach of fiduciary duty.

The remaining issue concerns the termination fee provision under the Power Project contract. The Tribe has argued that this provision violates La. Civ. Code art. 2012; however, the Tribe has not raised art. 2012/violation of public policy as an affirmative defense to Meyer's claim for damages under the contract. The Tribe is ordered to do so within the next 15 days to procedurally join this issue. Whether or not art. 2012 applies is a legal issue. The Court will decide this, and if art. 2012 applies, the Court will determine the amount, if any, to award as stipulated/liquidated damages. Meyer is limiting its damage claim to the contractual termination fee provision.

Judgment rendered in Chambers this <u>3</u> day of <u>Oct.</u>, 2013.

This language was also followed with an executed signature line for the trial court, but without the notation "for" which appeared on the September 24, 2013 judgment.

On the same day the trial court filed the revised reasons for judgment, the trial court upset the October 15, 2013 trial date; set January 21, 2014, as the new date for the trial on the merits; and executed and filed the first of three judgments addressing the rulings on the issues considered at the September 13, 2013 hearing.

18

The October 3, 2013 judgment reads in pertinent part as follows:

> This matter came before the Court on September 13, 2013 on Plaintiff's *Motion to Deem Facts Admitted and to Compel Production of Documents Re: MainNet.*
>
> . . . .
>
> After considering the parties' pleadings, evidence, exhibits, argument of counsel, the law, and for written reasons assigned in [sic] September 24, 2013,
>
> **IT IS ORDERED, ADJUDGED, AND DECREED** that the Motion to Deem Facts Admitted is **GRANTED**; moreover, the Court **ORDERS** attorneys' fees against Defendant in the amount of $2500.00 for its failure to respond appropriately to discovery and to this Court's prior orders regarding this discovery.
>
> **JUDGMENT RENDERED** partly in Open Court on the 13th day of September, 2013 and in writing on September 24, 2013.

The trial court executed a second judgment four days later on October 7, 2013. That judgment reads in pertinent part as follows:

> This matter came before the Court on September 13, 2013 on Plaintiff's *Motion for Partial Summary Judgment Re: Fraud; Motion for Partial Summary Judgment Re: Costs; and Motion for Summary Judgment.*
>
> . . . .
>
> After considering the parties' pleadings, evidence, exhibits, argument of counsel, the law, after having taken the matter under advisement, and for written reasons assigned in [sic] September 24, 2013;
>
> **IT IS ORDERED, ADJUDGED, AND DECREED** that the Motion for Partial Summary Judgment Re: Fraud is **GRANTED IN PART** ~~the Court finding that the Interim & Definitive Supplemental Agreement of January 14, 2003 and Work Authorization No. 1 are valid and binding and there is no issue of material fact concerning any vices of consent to the agreements;~~ [20]
>
> The remainder of the Motion for Partial Summary Judgment Re: Fraud is **DENIED IN PART,** the Court finding material issues of fact; the Motion for Partial Summary Judgment Re: Expenses is **DENIED**, and the Motion for Partial Summary Judgment is **DENIED.**

---

[20] The struck-through language is followed by the written initials of the trial court judge.

The trial court signed yet another judgment on October 11, 2013, which was filed for record on October 15, 2013, and again addressed issues raised in the various pleadings. That judgment reads in pertinent part as follows:

> This matter came before the Court on September 13, 2013 on Plaintiff's *Motion for Summary Judgment (Liability and Damages).*
>
> . . . .
>
> After considering the parties' pleadings, evidence, exhibits, argument of counsel, the law, and after further consideration of the parties' arguments and filings, and for the revised written reasons assigned on October 3, 2013,
>
> **IT IS ORDERED, ADJUDGED, AND DECREED** that there being no genuine issue of material fact that the Coushatta Tribe of Louisiana (the "Tribe") breached the Power Project contract, Plaintiff's Motion for Summary Judgment (Liability and Damages) is **GRANTED**, and the Tribe's claim based on breach of fiduciary duty is dismissed;
>
> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the Tribe shall amend its pleadings to allege La. Civ. Code article 2012 as an affirmative defense within 15 days to procedurally join all remaining issues; and, all other affirmative defenses are **DISMISSED;**
>
> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that all claims in reconvention against Richard T. Meyer, individually, are **DISMISSED;**
>
> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that this Court, on January 21, 2013, shall try the issue of whether the stipulated damages set forth in Plaintiff's Motion for Summary Judgment are so manifestly unreasonable as to be contrary to public policy such that the Court should modify them pursuant to La. Civ. Code Art. 2012.
>
> The Court will, in addition, determine the amount of attorney fees, if any, to which Plaintiff is entitled under the contractual provisions.

On the same day the last judgment was filed, the Tribe amended its pleadings to assert the affirmative defense that the termination fee sought to be collected by Meyer & Associates was "manifestly unreasonable, punitive, and

20

against public policy."

While the individual judgments themselves are difficult to equate to the particular claims raised in the exceptions and summary judgment motions, the litigants agree that the effect of all of the rulings on these preliminary motions was to reduce the trial to the sole issue of the damages sustained by Meyer & Associates. The three-day trial on this issue began on January 21, 2014, and at the conclusion of the evidentiary phase, the trial court took the matter under advisement. On February 19, 2014, the trial court issued written reasons awarding Meyer & Associates $10,603,250.00 in damages and $395,000.00 in reimbursable expenses. The trial court also awarded the engineering firm attorney fees, but did not set the amount. Instead, the trial court left the "amount to be determined either by agreement between the parties or in a future proceeding with the Court."

The trial court executed a judgment corresponding to its reasons for judgment on March 3, 2014.[21] Thereafter, the Tribe timely perfected the first of the consolidated appeals now before us, and Meyer & Associates timely answered that appeal. In this appeal, the Tribe asserted six assignments of error:

> 1) The Trial Court committed legal error in its interpretation of the contracts between the [Tribe] and [Meyer & Associates] and in its calculation of damages since there is no Termination Fee or penalty owed such that [Meyer & Associates'] claim should be dismissed.
>
> 2) The Trial Court committed legal error when it failed to find that the stipulated damages, or penalty for breach, were against public policy such that [Meyer & Associates'] claim should be dismissed.
>
> 3) The Trial Court committed legal error (both substantively and procedurally) when it summarily dismissed, in Chambers, without any motion being filed, pending and noticed, without any additional evidence being offered, and without any additional hearing being held, all of the [Tribe's] claims and affirmative defenses during the Pre-

---

[21] The trial court judgment does not differentiate between the damage award and the expense award. Instead, it simply awards Meyer & Associates a judgment against the Tribe in the amount of $10,998,250.00. The Tribe objected to the judgment, although the record does not establish whether the objection was to substance or form.

Trial Conference (12 days before the Jury Trial was scheduled to begin) under the auspices that the Trial Court was granting a previously denied Motion for Summary Judgment such that the Trial Court should be reversed and this matter remanded for a Jury Trial on all issues if [Meyer & Associates'] claim is not dismissed.

4) The Trial Court committed legal error when it awarded [Meyer & Associates] damages because any purported failure to perform by the [Tribe] was: (1) caused by [Meyer & Associates'] own bad faith and (2) was justified by a valid excuse such that [Meyer & Associates'] claim should be dismissed.

5) Assuming *arguendo* that [Meyer & Associates] is entitled to damages, the Trial Court committed legal error when it awarded [Meyer & Associates] judicial interest from June 8, 2005 in violation of applicable law such that the Trial Court should be reversed.

6) The Trial Court committed legal error when it did not properly compute the "Reimbursable Expenses" and double counted [Meyer & Associates'] expenses such that the Trial Court should be reversed.

In its answer to this first appeal, Meyer & Associates raised two assignments of error:

1) The trial court committed legal error by not enforcing the stipulated damage clause provided in the third and final contract, WA3, thereby awarding $10,998,250 instead of $12,902,339.

2) The trial court abused its discretion by allowing the Tribe to raise an affirmative defense after the deadlines for discovery and amending pleadings had passed.

After this initial appeal began moving through the appellate process, Meyer & Associates filed a motion to have the attorney fee award set. The trial court heard this motion on June 10, 2014, and for oral reasons stated that day, awarded Meyer & Associates an attorney fee judgment against the Tribe in the amount of $5,585,573.00. The trial court executed a judgment to that effect on June 23, 2014, and thereafter, the Tribe perfected the second of the two consolidated appeals now before us. In that appeal, the Tribe raises three assignments of error:

A. The Trial Court committed legal error when it awarded attorney's fees to [Meyer & Associates] where there is no record evidence in this Appeal authorizing an award of attorney's fees and the Trial Court

22

committed legal error when it awarded court costs to [Meyer & Associates] where there is no record evidence in this Appeal to support an award of court costs such that the Trial Court Judgment should be reversed.

B. The Trial Court committed legal error when it granted its Judgment of October 11, 2013 in companion Appeal Docket No. 1401109-CA, (Appeal 1401109-CA, R. Vol. 22, pp. 5438-5439) which ordered that the Trial Court would determine the amount of attorney's fees, if any, to which [Meyer & Associates] is entitled under the contractual provisions and which Judgment is null and void such that the resulting Judgment awarding attorney's fees and court costs is also null and void.

C. The Trial Court committed legal error when it awarded attorney's fees based on a Contingency Fee Agreement between [Meyer & Associates] and its Attorney as that award did not represent a reasonable fee; the [Tribe] was not a party to that Contingency Fee Agreement; and the award of $5,585,573 is excessive when there was no proof of the time spent working on the case, no proof to document the attorneys who worked on the case, no billing records, and where a substantial part of the time was spent defending Richard Meyer, individually, such that the Trial Court Judgment should be reversed.

**OPINION**

Because we find it dispositive of the issues before us, we will consider the Tribe's third assignment of error in its initial appeal first. In this assignment of error, the Tribe first argues that the trial court erred in changing its prior ruling by the issuance of the written reasons of October 3, 2014, without first holding a new hearing on the motion. Next, the Tribe argues that the trial court erred in granting summary judgment relief to Meyer & Associates on the issues of fraud and misrepresentation, thereby rejecting its right to claim fraud and misrepresentation as an affirmative defense at a trial on the merits; that the trial court erred in granting summary judgment relief to Meyer & Associates on the issue of fiduciary duty, thereby rejecting its right to claim breach of fiduciary duty as a cause of action and as an affirmative defense at a trial on the merits; and that the trial court erred in granting summary judgment relief on the issue of breach of contract,

23

thereby rejecting its right to assert at a trial on the merits that it did not breach the contract.[22]

***Previously Executed Judgment***
***and***
***Breach of Fiduciary Duty Summary Judgment Issues***

The first part of this assignment of error addresses the trial court's reversal of position without holding a new hearing. The Tribe argues that because the trial court reversed its position without any litigant requesting reconsideration of the previous ruling on the issue of intentional breach of fiduciary duty, the original ruling of the trial court should be reinstated and the matter remanded for trial on that issue. The Tribe's argument on this issue overlaps its argument that the trial court erred in granting the engineering firm summary judgment relief on the breach of fiduciary duty issue and, therefore, we will consider them together.

There exists a fundamental difference between reasons for judgment, oral or written, and the final judgment. In *Bellard v. American Central Insurance Co.*, 07-1335, 07-1399, p. 25 (La. 4/18/08), 980 So.2d 654, 671, the supreme court stated that there exists "the well-settled rule that the district court's oral reasons or written reasons for judgment form no part of the judgment, and that appellate courts review judgments, not reasons for judgment." Additionally, it has long been recognized that "where there are only written reasons and no separate signed judgment, there is no final judgment[,]" and that "[p]rior to final judgment, a trial judge may, at his discretion, change the substance or the result of interlocutory rulings. A trial judge may also sign a judgment based on written reasons which differ substantially from previously stated oral reasons." *Bordelon v. Dauzat*, 389 So.2d 820, 822 (La.App. 3 Cir. 1980) (citations omitted).

---

[22] The Tribe's third assignment of error does not clearly articulate that the rulings on the motions for summary judgment were a part of this assignment of error, but its argument under that assignment of error clearly establishes that these rulings are contested on appeal.

In this case, the trial court had rendered a written judgment on the fiduciary duty issue before the October 3, 2013 pretrial hearing. In that September 27, 2013 judgment, the trial court recognized the power project to be that of a joint venture, and ruled that the parties involved in the project owed reciprocal fiduciary duties.[23] At the pretrial conference, the trial court rendered a ruling stating that after reconsideration, it was now granting summary judgment in favor of Meyer & Associates on the issue of breach of fiduciary duties for the same reason it granted summary judgment on the issue of fraud. The problem with the trial court's ruling on this issue is that Meyer & Associates never asked for a finding that the Tribe had breached any fiduciary duties in its motion for summary judgment.

The Tribe filed the first motion addressing the issue of fiduciary duties on November 19, 2012. In that motion, the Tribe only sought a judgment establishing that the legal relationship between the parties was that of a joint venture. Meyer & Associates filed a cross-motion for summary judgment on August 30, 2013, wherein it also sought recognition of the project as a joint venture. However, the engineering firm did not seek a judgment finding that the Tribe had breached any fiduciary duties created by the joint venture arrangement. Thus, not only did the trial court change its previously issued judgment without a hearing or new filing, but it granted relief not prayed for. We find merit in the Tribe's argument that the trial court erred in granting the summary judgment finding that the Tribe had violated fiduciary duties it owed to Meyer & Associates. In reaching this decision, we need not consider whether genuine issues of material fact exist as to this issue.

In the remaining two summary judgments challenged by the Tribe, the issue is whether genuine issues of material fact exist which preclude the grant of

---

[23] In fact, at the September 13, 2013 hearing, the parties stipulated that each owed the other fiduciary duties.

summary judgment relief. In evaluating the record before us, we apply the *de novo* standard of review, and because of the evidentiary limitations placed on the analysis of each of these motions by the amendments to La.Code Civ.P. art. 966, we consider each separate from the other. In doing so, we find genuine issues of material fact exist in the issues addressed in both motions for summary judgment and find merit in the Tribe's argument that the trial court erroneously granted relief to Meyer & Associates.

The procedural aspects of the law applicable to summary judgment have changed with each legislative session over the past three years,[24] and the applicable provisions in a given case corresponds directly to the date of the hearing on the summary judgment motion or motions. Because the hearing in this matter occurred on September 13, 2013, all references in this opinion to La.Code Civ.P. art. 966 will be to the version of that article in effect on that date unless specifically stated otherwise.[25]

The 1996 version of La.Code Civ.P. art. 966(A)(2) proclaimed that "[t]he summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969[,]" and that "[t]he procedure is favored and shall be construed to accomplish these ends." That language remained unchanged in both the 2012 and 2013

---

[24] A new version of La.Code Civ.P. art. 966 passed by the legislature in 2015 as 2015 La. Acts, No. 422, § 1, took effect on January 1, 2016.

[25] The provisions of La.Code Civ.P. art. 966 had remained fairly constant with a minimum of amendments from its substantial modification by 1996 La. Acts, 1st Ex.Sess., No. 9, § 1 until 2012, when 2012 La. Acts, No. 257, § 1 and 2012 La. Acts, No. 741, § 1 made significant changes to the article, and primarily to the procedural and evidentiary aspects of the summary judgment process. The next year, these procedural and evidentiary aspects were revisited by the legislature, and new substantial modifications were made to the article by 2013 La. Acts, No. 391, § 1. This version of La.Code Civ.P. art. 966 was applicable to the September 13, 2013 hearing.

amendments, and at the time of the trial on the motions before us, it was still incorporated into La.Code Civ.P. art. 966(A)(2).

The 2012 and 2013 amendments did not change the nature of the evidence that could be considered by the trial court in a summary judgment proceeding, but did establish procedural rules for the admissibility of that evidence. Between 1996 and 2012, La.Code Civ.P. art. 966(B) (emphasis added) provided that the trial court could render a summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions *on file*, together with the affidavits, if any, show that there is no genuine issue as to material fact, and the mover is entitled to judgment as a matter of law." The 2012 amendments renumbered Subsection B as (B)(2), removed the words "on file" from that part of the article and changed La.Code Civ.P. art. 966(E)(2) to provide that "[o]nly evidence admitted for purposes of the motion for summary judgment shall be considered by the court in its ruling on the motion." However, the 2013 amendments moved the evidentiary requirements to La.Code Civ.P. art. 966(F)(2) (emphasis added), which reads as follows:

> Evidence cited in and attached to the motion for summary judgment or memorandum filed by an adverse party is deemed admitted for purposes of the motion for summary judgment unless excluded in response to an objection made in accordance with Subparagraph (3) of this Paragraph. *Only evidence admitted for purposes of the motion for summary judgment may be considered by the court in its ruling on the motion.*

This was the evidentiary requirement of the summary judgment procedure at the time of the September 13, 2013 hearing.

The intended effect of the 2012 and 2013 amendments was to establish that no longer could a trial court (or reviewing court for that matter) consider any and all pleadings, depositions, answers to interrogatories, admissions, and affidavits in

27

the record when considering a motion for summary judgment. Instead, the analysis of the motion was limited to consideration of only the pleadings, depositions, answers to interrogatories, admissions, and affidavits properly admitted for the purpose of the motion for summary judgment.[26]

While the legislature significantly changed the procedural aspects of summary judgment law in 2012 and 2013, the recent amendments did not substantially change the long-standing burden of proof imposed on the mover in a summary judgment motion, and at the time of the trial of the motions at issue, it was set out in La.Code Civ.P. art. 966(C)(2) and read as follows:

> The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

Furthermore, all of the recent changes to La.Code Civ.P. art. 966 did not change the well-settled rule that in evaluating a summary judgment issue, the trial court is precluded from making credibility determinations and must evaluate inferences from undisputed facts in a light most favorable to the party opposing the motion. *Indep. Fire Ins. Co. v. Sunbeam Corp.*, 99-2181, 99-2257 (La. 2/29/00), 755 So.2d 226. Nor did they change the long-standing rationale that "[a] motion for summary judgment is rarely appropriate for a determination based on subjective facts, such as intent, motive, malice, knowledge, or good faith."

---

[26] Many of the exhibits filed by both litigants in support of their respective positions on the various motions for summary judgment do not meet the evidentiary standards for consideration as set forth in La.Code Civ.P. art. 966(B)(2), nor are they attached to exhibits that do.

*Baldwin v. Bd. of Supervisors for Univ. of La. Sys.*, 06-961, p. 7 (La.App. 1 Cir. 5/4/07), 961 So.2d 418, 422. As noted in *Smitko v. Gulf South Shrimp, Inc.*, 11-2566, p. 7 (La. 7/2/12), 94 So.3d 750, 755, "[a]ppellate review of the granting of a motion for summary judgment is *de novo*, using the identical criteria that govern the trial court's consideration of whether summary judgment is appropriate."

The prohibition against the trial court considering anything other than the evidence admitted for the purpose of a particular summary judgment, as set forth in La.Code Civ.P. art. 966(F)(2), directly affects the review of the judgments at issue because they were all heard and considered in one hearing. At the September 13, 2013 hearing, the trial court attempted to address what the court minutes of that day describe as "all outstanding Motions and/or Exceptions filed on behalf of the Parties[.]" At the beginning of that hearing, the trial court attempted to address the issues in some semblance of order. However, when argument on the issues began, everything simply overlapped. The result was that at the end of the day-long hearing, all of the issues had been lumped together and it is somewhat unclear as to which evidence was considered for which motion. However, because the review by this court is *de novo*, we can address the issues without regard to these drawbacks.

### *Fraud and Misrepresentation Summary Judgment*

With regard to the fraud and misrepresentation claims asserted by the Tribe in its answer and reconventional demand, the trial court initially granted the engineering firm's exception of prescription as to the reconventional demand claims, but rejected the exception as to the affirmative defense claims. However, the trial court then eliminated fraud and misrepresentation as an affirmative defense by granting the engineering firm's September 12, 2012 motion for

29

summary judgment. The Tribe asserts that the trial court erred in granting that summary judgment.[27]

"A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La.Civ.Code art. 1906. It "is formed by the consent of the parties established through offer and acceptance." La.Civ.Code art. 1927. Fraud is one of the three vices of consent in a contractual relationship. La.Civ.Code art. 1948. Louisiana Civil Code Article 1953 defines fraud as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." With regard to the burden of proving fraud, La.Civ.Code art. 1957 provides that "[f]raud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence." This court noted in *Sepulvado v. Procell*, 12-271, p. 5 (La.App. 3 Cir. 10/3/12), 99 So.3d 1129, 1134, that:

> In order to succeed on an action for fraud against a party to a contract, three elements must be proved: (1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to the contract.

Thus, in order to be successful in obtaining summary judgment relief from the Tribe's assertions of fraud, Meyer & Associates had "to point out to the court that there is an absence of factual support for one or more" of the three elements required to be proven by the Tribe. La.Code Civ.P. art. 966(C)(2).

The misrepresentation cause of action has been recognized as arising from La.Civ.Code arts. 2315 and 2316, and was discussed in the context of a Bank's

---

[27] The Tribe does not question the grant of the prescription exceptions addressing their claims in their reconventional demand. Instead, they challenge only their right to claim all of these matters as affirmative defenses to the engineering firm's claim for damages.

30

obligations in *Succession of McKnight*, 33,802, pp. 5-6 (La.App. 2 Cir. 10/4/00), 768 So.2d 794, 798, *writ denied*, 00-3072 (La. 2/9/01), 785 So.2d 822, with the following analysis:

> In general, the courts of this state have recognized that LSA-C.C. arts. 2315 and 2316, the codal articles defining tort law, encompass an action for negligent misrepresentation. The broad language of Articles 2315 and 2316 affords protection for persons damaged by the negligent acts of others sufficient to encompass a cause of action for negligent misrepresentation. *Daye v. General Motors Corp., et al.*, 97-1653 (La.9/9/98), 720 So.2d 654; *Barrie v. V.P. Exterminators, Inc.*, 625 So.2d 1007 (La.1993). Under Article 2315, "every act whatsoever of man that causes damage to another obliges him by whose fault it happened, to repair it." In order to find a bank liable under Article 2315, it must first be determined that the bank owed a fiduciary duty to the plaintiff. *Guidry v. Bank of LaPlace*, 94-1758 (La.App. 4 Cir. 9/15/95), 661 So.2d 1052.
>
> Appellate courts have integrated the cause of action for negligent misrepresentation and misinformation into the duty-risk, negligence analysis. Thus, for the cause of action to arise—whether plaintiff is a third party or a party to the contract or transaction—there must be a legal duty on the part of the defendant to supply correct information, there must be a breach of that duty, and the breach must have caused plaintiff damage. *Daye v. General Motors Corp.*, *supra*; *Barrie v. V.P. Exterminators, Inc.*, *supra*; *Cagle v. Loyd*, 617 So.2d 592 (La.App. 3d Cir.1993), *writ denied*, 620 So.2d 877 (La.1993).

To be successful under a duty/risk analysis, a plaintiff must establish five elements: (1) that defendant had a duty to conform his conduct to a specific standard; (2) that defendant's conduct failed to conform to that standard; (3) that defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) that the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) that the plaintiff sustained damage. *Hanks v. Entergy Corp.*, 06-447 (La. 12/18/06), 944 So.2d 564. Thus, in order to be successful in obtaining summary judgment relief from the Tribe's assertions of misrepresentation, Meyer & Associates had "to point out to the court that there is an absence of factual support for one or more" of

31

the five elements required to be proven by the Tribe. La.Code Civ.P. art. 966(C)(2).

The Tribe's primary assertions of fraud related to facts surrounding the General Agreement and the manner in which the engineering firm caused the Tribe to pass the Resolution which gave Chairman Poncho the authority to enter into the subsequent agreements with Meyer & Associates. Thus, the issue was whether the original contracts were entered into with the requisite consent. However, Meyer & Associates did not address this assertion in its motion for summary judgment on the fraud issue. Instead, it addressed only the claims of continuing fraud and misrepresentation after passage of the initial Resolution.[28]

Meyer & Associates filed its motion for summary judgment on these issues on September 12, 2012. By that time, the 2012 amendments to La.Code Civ.P. art. 966 had come into effect, requiring the actual filing of any evidence offered in support of, or in opposition to, a summary judgment. La.Code Civ.P. art. 966(E)(2). It was not until the effective date of the 2013 amendments that an attachment to the motion and/or memorandum satisfied the filing requirement. Meyer & Associates attached three exhibits to its original motion, and counsel for the engineering firm moved for the filing of these into evidence at the September 13, 2013 hearing. The exhibits are described as follows:

(1) The affidavit of Lovelin Poncho with concurring affidavits from Leonard Battise and William Worfel. Attached to, and made a part of, the affidavits are twenty-one attachments.

(2) The Tribe's responses to requests for admissions propounded to the Tribe by Meyer & Associates.

---

[28] At the September 13, 2013 hearing, counsel for Meyer & Associates offered the exhibit attached to the engineering firm's September 11, 2013 reply to the Tribe's September 9, 2013 opposition to Meyer & Associates' August 30, 2013 motion for summary judgment on the issue of breach of contract by the Tribe. Attached to this opposition was an excerpt from Chairman Poncho's deposition wherein he discussed the earlier aspects of the Tribe's interaction with Mr. Meyer in entering into the Interim Agreement.

(3)  The Tribal Council Meeting Minutes of June 14, 2005.

The last exhibit does not fit within any of the categories of admissible evidence listed in La.Code Civ.P. art. 966(B)(2).

Mr. Poncho asserted in his affidavit that he served as the Council Chairman from June of 1986 through June of 2005, and that during that time, the Tribal Council commonly negotiated commercial contracts, and that many of those contracts contained provisions pertaining to dispute resolution and the waiver of sovereign immunity.  He claimed to have personally negotiated some of the contracts in his capacity as Chairman, and on most occasions these contracts contained dispute resolution and sovereign immunity provisions included without obtaining the prior approval through a tribal resolution.  He further asserted that either he or his designee was given full authority in the unanimously adopted January 14, 2003 Resolution to enter into any agreement required for the development of the power project.  Pursuant to this authority, he executed the Interim Agreement on behalf of the Tribe as well as Memorandums of Understanding (MOUs) with potential offtakers Valley Electric and the Cities of Natchitoches, Minden, and Ruston.[29]

According to Mr. Poncho's affidavit, a dissident faction of the Tribe began interfering with the administrative affairs of the Tribal Council in early February of 2004,  and that because of their concern over the effect these dissidents might have on the power project, he, Mr. Battise, and Mr. Worfel issued letters to the offtakers reasserting their authority over the project and the affairs of the Tribe and informing the offtakers of steps the Tribe would be taking to insulate the power

_____

[29] While Chairman Poncho claims to have "executed" the MOUs, Section 1.8.2 gives Meyer & Associates the "exclusive right to negotiate Memorandum of Understandings (MOU's) and Power Sales Agreements (PSA's) power sales contracts with Valley Electric Co-op (Valley [sic]), the cities of Natchitoches, Minden and Ruston, Louisiana, and other potential purchasers of the output."

33

project from Tribal politics, including creating corporations to take over the power project. He stated that both WA#2 and WA#3 were entered into in an effort to further enhance the stability of the power project in the eyes of the offtakers; as was the passage of Resolutions 2005-A, 2005-B, 2005-C, 2005-D, and 2005-E.

Mr. Poncho did not assert that Resolutions 2005-A through E were passed in a regular or specially called Tribal Council meeting. Instead, he simply asserted that they were agreed upon by a majority of the members of the Tribal Council (Mr. Poncho, Mr. Battise, and Mr. Worfel).[30] He also asserted that the particulars of WA#3 were agreed upon by the same three participating majority members of the Tribal Council, and that WA#3 was in the best interest of the Tribe for the following reasons:

> The action taken by the Tribal Council with respect to WA#3 was, in fact, in the best interest of the Tribal Membership by insulating the Tribe's economic development activities from political in-fighting. At the same time, WA#3 required the Developer to reimburse the Tribe if the project moved forward to success without the Tribe due to such interference and interruption. However, if the project moved forward to success with the Tribe's involvement, the initial investment by the Tribe was to be returned at project closing and the Tribe thereafter would receive the required annual Return on Investment every year for the next 20 – 30 years without recourse risk to the Tribe.

Finally, Mr. Poncho asserted in his affidavit that no outside entity would enter into a large financial commitment with the Tribe, such as the power project, unless the Tribe agreed to include a waiver of sovereign immunity and forum selection provisions in the contract. He provided no corroboration for this position.

Mr. Battise, a former Tribal Council Member from June of 1997 through June of 2005, and former Vice Chairman from June of 2003 through June of 2005,

---

[30] The body of all these resolutions begins with the statement "**BE IT RESOLVED BY the Tribal Council of the Coushatta Tribe of Louisiana[.]**" However, the Resolutions designated as A, B, C, and E assert in the certification statement only that they were adopted by the Tribal Council on a particular day (A, B, and C states the date of adoption as March 15, 2005, while E asserts a date of adoption as March 22, 2005). The certification of the Resolution designated as D asserts that it was "acted upon . . . at a meeting held on March 15, 2005[.]"

concurred with the statements contained in Mr. Poncho's affidavit; as did Mr. Worfel, a former Council Member from June of 1998 through August 10, 2005, during which time he also served as Vice Chairman and Secretary-Treasurer.

The answers to the requests for admissions propounded by Meyer & Associates to the Tribe established the following facts: (1) the Tribal Council is the sole governing body of the Tribe, and all of the Tribe's governmental authority rests with the Tribal Council; (2) three members of the Tribal Council constitute a quorum at a properly noticed and called meeting of the Tribal Council and, therefore, can conduct the business of the Tribe; (3) in June 2005, David Sickey, as Council Member, directed the cancellation of a "Participants Meeting with Offtakers at Coushatta Casino Resort[;]" (4) on or about September 17, 2005, one or more members of the Tribal Council released a document entitled, "Payments to Bracewell & Ieyoub[,]" to persons who were not Tribal Council Members; and (5) at a Tribal Council meeting on October 10, 2005, the Tribal Council replaced Mr. Worfel with Mr. Sickey as the Tribe's authorized representative on the power project and adopted Resolution 2005-66.

As previously stated, this evidence does not address the fraud and misrepresentation issues raised by the Tribe in its answer and reconventional demand. That being the case, we do not find that Meyer & Associates ever met its burden of proof as set forth in La.Code Civ.P. art. 966(C)(2), "to point out to the court that there is an absence of factual support for one or more elements essential to [the Tribe's] claim, action, or defense." Thus, the burden never shifted to the Tribe to establish that it "will be able to satisfy [its] evidentiary burden of proof at trial[.]" *Id.*

Nor do we find that the attempted introduction of Chairman Poncho's

35

deposition testimony cures this defect in the engineering firm's motion on these issues. First, that deposition was attached to an opposition to another filing not related to the issues of fraud and misrepresentation, and to allow it to be introduced as the only proof of the engineering firm's position on the issues of fraud and misrepresentation would amount to trial by ambush. Equally important, while Meyer & Associates filed the opposition timely pursuant to District Court Rule 9.9, as provided for in La.Code Civ.P. art. 966(B)(1), that Rule only allows for the filing of a "reply memorandum" and not additional exhibits.

Because we find that Meyer & Associates did not present sufficient evidence to cause the burden of proof to shift to the Tribe on the issue of fraud and misrepresentation, we find that the trial court erred in granting summary judgment relief to the engineering firm on these issues. That being the case, we need not consider the evidence presented by the Tribe in opposition to the engineering firm's motion.[31]

### *Breach of Contract Summary Judgment*

Finally, the Tribe asserts that genuine issues of material fact exist concerning whether it breached the contract through the actions of the newly-elected Tribal Council suspending work on the power project at its first Tribal Council meeting in June of 2005. That being the case, the Tribe argues, the trial court erred in granting summary judgment to Meyer & Associates on this issue.

Louisiana Civil Code Article 1983 provides that "[c]ontracts must be performed in good faith." A party having obligations under a contract "is liable for the damages caused by his failure to perform a conventional obligation." La.Civ.Code art. 1994. Furthermore, "[a] failure to perform results from

---

[31] While we note that the Tribe also filed a motion for summary judgment on these issues, it does not appeal the trial court's denial of its motion.

nonperformance, defective performance, or delay in performance." *Id.* A party to a contract breaches that contract by (1) undertaking an obligation to perform; (2) failing to perform that obligation; and (3) the party entitled to performance suffers damages from the failure to perform. *Sanga v. Perdomo*, 14-609 (La.App. 5 Cir. 12/30/14), 167 So.3d 818, *writ denied*, 15-222 (La. 6/19/15), 172 So.3d 650.

In an attempt to meet its summary judgment burden on the issue of breach of contract by the newly elected Tribal Council, Meyer & Associates attached eight exhibits to its motion for summary judgment:[32]

(1)     The affidavit of Richard T. Meyer. Attached to, and made a part of, the affidavit are nine attachments.

(2)     Excerpts from the deposition of Kevin Sickey. Attached to, and made a part of, the deposition are five attachments.

(3)     The Tribe's February 22, 2010 amended responses to requests for admissions by Meyer & Associates.

(4)     Excerpts from the deposition of Thomas James Epperson, the designated representative of Valley Electric.

(5)     Excerpts from the deposition of Cordell Grand, the designated representative of Louisiana Energy & Power Authority.

(6)     The Tribe's responses to Meyer & Associates' July 5, 2013 requests for admission and requests for production of documents.[33]

(7)     The trial court's October 19, 2013 judgment denying the Tribe's motion to compel and granting Meyer & Associates' motion for protective order.[34]

(8)     Excerpts from the deposition of Ralph J. Stephens. Attached to, and made a part of, the deposition is one attachment.

---

[32] Meyer & Associates filed this motion for summary judgment after the effective date of the 2013 amendments to La.Code Civ.P. art. 966. Thus, attachment of the exhibits to the motion caused them to be "deemed admitted" pursuant to La.Code Civ.P. art. 966(E)(2).

[33] These responses pertain to issues which have no bearing on the breach of contract issue.

[34] This exhibit is not one of the items of evidence allowed to be considered by La.Code Civ.P. art. 966(B)(2). However, the trial court may take judicial notice of the judgment pursuant to the authority of La.Code Evid. art. 201.

Mr. Meyer's affidavit establishes that he is a registered civil and environmental engineer and the vice president of Meyer & Associates. He became the general consultant and project manager for the Tribe's power project through the authority of the Interim Agreement. However, even before entering into the Interim Agreement, Mr. Meyer, on behalf of Meyer & Associates, consulted experts knowledgeable in developing power plants and obtaining customers to purchase the power; and he prepared a Feasibility Study based on the information he obtained. Additionally, he contacted potential power offtakers and obtained MOUs from Minden, Natchitoches, Ruston, and Valley Electric. The Interim Agreement was authorized by the unanimous Tribal Council's adoption of the Resolution formally approving the power project.

Mr. Meyer asserted in his affidavit that the Interim Agreement merely amended the General Agreement to add the electrical power project to the list of projects that Meyer & Associates had contracted to complete with and/or on behalf of the Tribe. The purpose of the Work Authorizations, according to Mr. Meyer, was to supplement the Interim Agreement by identifying the specific work to be performed at a given stage of the project's development.

According to Mr. Meyer, the actions of a dissident tribal faction began to cause potential offtakers to express concerns about the project by February of 2004; and when these offtakers requested assurances from the Tribal Council that the power project would continue despite the actions of the dissidents, members of the then Tribal Council provided letters of reassurance. Mr. Meyer asserted that when the letters of reassurance failed to lessen the offtakers' fears, he and members of the then Tribal Council took steps to amend the existing agreements to increase the scope of the power project based on the addition of LEPA as an

offtaker.

Mr. Meyer asserted that this amendment effort resulted in the adoption of WA#2, which took effect on May 1, 2004. He acknowledged that WA#2 included substantial penalty provisions favorable to Meyer & Associates; and that these provisions were intended to bolster the offtaker's support for the project and to discourage the dissident faction from derailing the project. He understood WA#2 to provide that a mere interruption of Phase 2 activities by the Tribe would trigger the penalties owed to the engineering firm.

Apparently WA#2 was not sufficient to reassure the offtakers because Mr. Meyer asserted in his affidavit, that the purpose of the adoption of five resolutions in March of 2005, and the execution of WA#3 was also necessary in order to insulate the power project from tribal politics. Mr. Meyer stated that "[t]he Tribal Council believed that its actions in adopting the various resolutions and executing [WA#3] were in the best interest of the Tribal Membership in securing the completion of the Power Program to conclusion." Mr. Meyer asserted that the June 2005 action of the newly-elected Tribal Council, to suspend the power project constituted a breach of the contractual agreements, particularly WA#2 and WA#3.

Kevin Sickey replaced Mr. Poncho as Tribal Council Chairman in the 2005 election. In excerpts from his deposition offered by Meyer & Associates on the issue of breach of contract, Mr. Sickey acknowledged that the newly-elected Tribal Council desired to lead the Tribe in a direction different from its predecessors. Although he did not recall making the statement at the first Tribal Council meeting after the election, he acknowledged that the minutes of that June 14, 2005 meeting state that he said, "I want you to halt all Richard Meyer projects for now." He further acknowledged that at the time of the meeting, the power project was the

39

only Tribal project in which Mr. Meyer had an involvement.

Mr. Sickey testified that he had no recollection of Mr. Meyer scheduling a meeting with the offtakers on Tribal property or if that meeting was canceled by his brother, David Sickey.[35] He acknowledged, however, that if his brother did cancel the meeting, it was pursuant to the authority he was given in the June 14, 2005 Tribal Council meeting. Mr. Sickey further acknowledged that the new Tribal Council passed a resolution naming him in the place of Mr. Worfel as the Tribe's authorized representative on the power project.

The Tribe's amended responses to Meyer & Associates' requests for admissions established that it is governed by a Tribal Council, with the Tribal Council Chairman as the chief executive officer; that a tribal ordinance or resolution can be acted upon by three members of the Tribal Council, but only if the vote occurs at a properly noticed meeting with a quorum present; and that only the Tribal Council has the authority to enter into contracts or spend the Tribe's money. The responses further established that David Sickey canceled the power project meeting scheduled with the offtakers in June of 2005, and that a council member released information pertaining to "Payments to Bracewell & Ieyoub," to non-council members on September 17, 2005. However, the admissions further established that while the Tribe was represented by counsel during the development of the power project, Mr. Meyer admitted to the Tribal Council, after Mr. Sickey's election, that none of the power project agreements were reviewed by counsel for the Tribe prior to their execution.

Mr. Epperson testified in his deposition that Valley Electric was definitely interested in pursuing the power project with the Tribe. However, he stated that by

_____

[35] David Sickey was elected as a member of the Tribal Council in the 2005 election.

40

December 20, 2005, Valley Electric was not sure that the Tribe would complete the project based on the new Tribal Council's announcement that it was withdrawing its support for the project and its cancelation of the power project meeting.

Mr. Grand testified that the intent of the power project meeting was to provide face-to-face time between the team members and the people they would ultimately be contracting with. Although he did not recall the reason behind the meeting's cancelation, he stated that this marked the beginning of the project's ending.

In opposition to Meyer & Associates' motion, the Tribe introduced a total of nineteen exhibits, with only the first five complying with the evidentiary requirements of La.Code Civ.P. art. 966(B)(2):

(1)    The September 6, 2013 affidavit of Lovelin Poncho.[36]

(2)    Dr. Richard D. Tabors' November 12, 2012 affidavit.[37]
Attached to, and made a part, of the affidavit is one attachment.

(3)    Dr. Tabors' November 16, 2013 affidavit.

(4)    Excerpts from the deposition of Thomas James Epperson, the designated representative of Valley Electric.

(5)    Excerpts from the deposition of Cordell Grand, the designated representative of Louisiana Energy & Power Authority.

(6)    A July 11, 2005 memorandum from Mr. Meyer to Mr. Grand, regarding an update on the background of the power project development team.

(7)    A June 17, 2005 email from Mr. Grand to Kevin Bihn.

---

[36] During the September 13, 2013 hearing, the trial court orally granted Meyer & Associates' motion to strike this affidavit. A judgment granting the motion was rendered by the trial court on September 27, 2013. Because the Tribe has not appealed this judgment, Mr. Poncho's affidavit will not be considered in our review of the trial court's grant of summary judgment in favor of Meyer & Associates on the issue of breach of contract.

[37] The Tribe made this affidavit a part of its offering in opposition to the engineering firm's motion for summary judgment on the fraud issue, but we disposed of that issue without having to address the content of the affidavit.

41

(8)    A November 19, 2004 letter from Mayor of Minden to Mr. Worfel.

(9)    A December 1, 2004 letter from the Mayor of Ruston to Rex Bryan with LEPA.

(10)   A July 7, 2004 letter from the Mayor of Ruston to Mr. Worfel and Ted Jones and Rex Bryan with the Louisiana Power Group.

(11)   A May 10, 2005 letter from Mr. Worfel and Mr. Meyer to Mr. Grand.

(12)   A Second Addendum to the MOU between the Tribe and Natchitoches.

(13)   A March 30, 2006 letter from Mr. Meyer to Mr. Grand, regarding the third amendment letter of intent between the Tribe and LEPA.

(14)   A May 8, 2006 letter from Mr. Grand to Mr. Meyer.

(15)   A December 29, 2006 letter from the Mayor of Natchitoches to Mr. Bryan.

(17)   A Third Addendum to the MOU between the Tribe and Natchitoches.

(18)   A February 7, 2006 email memorandum from Mr. Meyer to Mr. Epperson.

(19)   The transcribed portions from an August 18, 2005 meeting between Mr. Meyer and the Tribe.

Dr. Tabors' November 12, 2012 affidavit establishes that he is a former member of the research staff and faculty of Massachusetts Institute of Technology (MIT) in Cambridge, Massachusetts; and at the time he submitted his affidavit, he served as the President and a principal owner of Across the Charles, an energy, water, and wastewater consulting group in Cambridge, Massachusetts.[38]

In his affidavit, Dr. Tabors concentrated primarily on the events leading up to the Tribe's passage of the January 2003 Resolution. It was his opinion that Meyer & Associates made numerous misrepresentations to the Tribe during the

---

[38] The consulting group itself is an affiliate of MIT.

42

early discussions concerning the electrical power project, and that these misrepresentations continued through the passage of the Resolution and the negotiation of the Interim Agreement. Specifically, Dr. Tabors concluded that Mr. Meyer misrepresented and overstated the conclusions of the Feasibility Study and the overall feasibility of the power project, and based his recommendations on the perceived advantages the Tribe would receive from the Native American Energy Bill (Energy Bill) under consideration at that time in the United States Congress. According to Dr. Tabors, the Energy Bill had many restrictions and requirements not taken into consideration by Mr. Meyer in presenting the project to the Tribe.

Dr. Tabors further asserted in his affidavit that numerous conclusions found in the Feasibility Study, while basically accurate as far as they went, constituted a suppression of the facts surrounding the complete situation. Dr. Tabors listed the following assertions contained in the Feasibility Study, but with the addition of what he considered the obvious drawbacks not divulged to the Tribe:

    a.    CFB technology (solid fuel) offers the lowest price but would take considerable time to build;

    b.    A 530 MW Combined Cycle might meet the price point but the Tribe would have to absorb the fuel price risk and the risk of a competitive market to sell the excess energy;

    c.    Smaller plants could meet the cost constraint but only with significantly long financing;

    d.    There is no expectation that a long term fixed price fuel contract can be negotiated for natural gas and therefore the Tribe and or Valley [Electric Membership Cooperative] would have to absorb the risk;

    e.    "Power pricing in the region is currently quite competitive. It is understood that pricing in the vicinity of \$35/MWH (\$0.035/kWh) has been recently quoted;" [and]

    f.    "It is expected that, while scenarios can be put together that project a power price that beats the 4.5 cent value expressed by Valley as their current offer, *it is likely that the market will meet*

*any price that can be achieved*.  Additionally, the ability or the desire of the parties to put in place the long term financing and assume the financial risks involved, as well as the advisability of doing so, must be reviewed carefully." (emphasis added)

(Parentheticals omitted.)

Dr. Tabors stated that had these drawbacks been divulged, anyone with an understanding of the scope of the project who read the Feasibility Study would have questioned the project's feasibility.  This would have been especially true of an experienced power development team.  Dr. Tabors opined in his affidavit that there were at least three major problems with the power project:

   a.    The conceptual project is simply too small to achieve the economies that the power grid in Louisiana can achieve.

   b.    The fuel risk, particularly with Valley, associated with moving ahead with a project that could be implemented in a reasonable frame are very large and would need to be understood by all of the financial players.

   c.    The market in Louisiana in 2002 is **VERY** competitive and any project that the CTOL and Valley might put together on paper will be trumped by an existing player in the market.

Other instances of fraud and or misrepresentation pointed out by Dr. Tabors in his affidavit included, but were not limited to, the following:

   In the December 17, 2002 slide presentation Mr. Meyer made numerous misleading statements.  Specifically, the slide presentation reported that a solid fuel plant provided the best chance for long term pricing stability, despite the Feasibility Study's conclusion that no project would be feasible in a competitive market paying only 3.5 cents per kWh.  Additionally, in the contract negotiations, Meyer & Associates failed to provide a reasonable time or cost estimate to the Tribe; failed to discuss the risk, uncertainties, or the contingencies of the power project; and failed to provide the Tribe with the information necessary for it to make an informed decision, which information was available and known to Meyer & Associates.  Additionally, Mr. Meyer failed to mention contingencies should the Energy Bill be delayed and the impact of that delay on the project, the market, or the offtakers; and told the Tribe that the power plant generation unit would run one hundred percent of the time, despite the fact that its actual run time would be less, based on maintenance and forced outages.

With regard to his response to questions raised by Mr. Langley in two memoranda he submitted after the December 17, 2002 presentation, Mr. Meyer ignored, criticized, or declared the questions premature. Mr. Meyer avoided Mr. Langley's questions regarding the risk and uncertainty of the project by relying on its previously created "Safeguard Targets," which were included in the Resolution.

The content of the Work Authorizations were not normal and were unprofessional in that they benefited Meyer & Associates with no corresponding benefit to the Tribe. Despite the joint venture nature of the project, the Work Authorizations prevented any meaningful participation in the power project by the Tribe, and provided that anything considered interference by the Tribe would entitle Meyer & Associates to collect the Termination Fee and assignment of all the work product; prevented the Tribe from accessing any of the products or contracts entered into on its behalf by the engineering firm during the development process despite the fact that the Tribe was funding the project; and classified many work product documents requiring no confidential treatment as confidential to preclude the Tribe's access to those documents. Furthermore, the termination provisions contained in WA#2 and WA#3 were not generally consistent with the standards of the Power Industry.

Meyer & Associates continued to misrepresent the facts in various status reports to keep the Tribe in line; had a scheduled work sequence that made no sense from an engineering project scheduling standpoint; and charged the Tribe for committing it to long term contracts knowing that the project was not feasible.

Finally, Dr. Tabors stated that Meyer & Associates' misrepresentations to the Tribe resulted in violations of the following Code of Ethics of Professional Engineering provisions:

a.  Engineers shall perform services only in the areas of their competence.

b.  Engineers shall undertake assignments only when qualified by education or experience in the specific technical involved.

c.  Engineers shall act for each employer or client as faithful agents or trustees.

d.  Engineers shall avoid deceptive acts.

e.  Engineers shall advise their clients or employers when they believe a project will not be successful.

The Tribe basically introduced the same excerpts from the depositions of Mr. Epperson and Mr. Grand as did the engineering firm. Mr. Epperson did testify, however, that the causes of the failure of the power project could be traced to both the delays and revisions to the project as well as the changes in the Tribal Council. Mr. Grand added the assertion that, in 2006, when it became apparent that the Tribe no longer supported the power project, Mr. Meyer discussed the possibility of continuing the project.

In his November 16, 2012 affidavit, Dr. Tabors addressed the dispute between the engineering firm and the Tribe over the reimbursement of certain expenses claimed by Meyer & Associates.[39] In addressing this issue, Dr. Tabors acknowledged that his review had been limited by the inability of the Tribe to gain access to numerous power project documents in the possession of Meyer & Associates. However, based on the information made available to him, he reached the conclusion that Meyer & Associates was a small engineering firm not capable of handling an electrical power project of the magnitude envisioned by the agreements between the engineering firm and the Tribe, and consultant specialists were a necessity to the success of the project. However, he concluded that compensation for these specialists was not a reimbursable expense, because they were part of the group responsible for the development of the power project. In fact, Dr. Tabors concluded that Meyer & Associates performed no engineering work on the project. Instead, "[the engineering firm's] work appear[ed] to have exclusively involved issuing correspondence, generating presentations and incorporating the work of others."

Dr. Tabors also concluded in this affidavit that Meyer & Associates failed to

---

[39] This issue was the subject of the motion for partial summary judgment filed by Meyer & Associates on October 11, 2012.

invoice the Tribe in a timely manner in that when the contractual relationship dissolved, he billed for reimbursement of these amounts beginning in August of 2003 and extending into June of 2007. Many of these, according to Dr. Tabors were not properly documented. Furthermore, he opined that Meyer & Associates continued to maintain the project long after it was clear it had ceased to be viable.

In its initial written reasons for judgment, the trial court couched the breach of contract issue in the context of the events surrounding the initial negotiations leading up to the passage of the Resolution and the negotiation of the Interim Agreement. The trial court found factually that the initial agreement was an "arms-length transaction" and that "there [was] no genuine issue of material fact that [Meyer & Associates] made misrepresentations or omissions of facts to the CTOL at this stage of the program." The trial court did find in those same written reasons that there did exist "genuine issues of material fact regarding the work authorizations entered into between the CTOL and [Meyer & Associates] subsequent to the interim agreement of January 14, 2003 and whether [Meyer & Associates] breached its fiduciary duty owed to the Tribe, specifically on the issue of [Meyer & Associates'] compensation and the CTOL's exposure under the contract." However, in its written reasons of October 3, 2013, the trial court reversed the second part of its analysis and concluded that there existed no genuine issue of material fact but that the Tribe breached the contracts by halting all Meyer & Associates projects, cancelling the meeting of the offtakers, and removing Mr. Worfel as the Tribe's authorized representative.

We find that the trial court erred in reaching its ultimate conclusions. Dr. Tabors' November 12, 2012 affidavit raises genuine issues of material fact concerning the manner in which the project was presented to the Tribe, and that

47

which occurred thereafter would have given a new administration cause to suspend action on the project and investigate the full nature of the project. This is particularly true given the fact that the evidence presented by Meyer & Associates in support of this motion for summary judgment establishes that the changes in the project accomplished by the adoption of WA#2 and WA#3 benefited only one party, the engineering firm. These changes did not "define the scope of services to be provided and method and amount of compensation and other appropriate terms and conditions consistent with the agreement" as a work authorization is defined in Article 9.1 of the General Agreement. Rather, as suggested by Mr. Meyer in his affidavit, the changes created a situation such that even an interruption of Phase 2 activities would trigger the newly increased and extremely severe penalty provisions in favor of the engineering firm. This fact, coupled with the fact that WA#2 pulled tasks from Phase 3 back into Phase 2, and thereby kept the penalty provisions viable, clearly established genuine issues of material fact concerning the appropriateness of the reaction of the newly-elected Tribal Council to the status of the project.

We find that the trial court erred in granting the engineering firm's motion for summary judgment on the issue of breach of contract.

Having found that the trial court erred in granting Meyer & Associates relief in the three motions for summary judgment addressed herein, we need not consider the assignments of error arising from the trials that followed. In fact, our reversal of the summary judgments herein mandates that we also vacate both judgments on the merits.

### DISPOSITION

Based on the foregoing, we reverse the grant of summary judgment to Meyer

& Associates, Inc. on the issue of fraud and misrepresentation, finding that Meyer & Associates, Inc. failed to prove that no genuine issues of material fact remain on these issues; we reverse the grant of summary judgment to Meyer & Associates, Inc. on the issue of breach of fiduciary duties because this issue was not properly before the trial court; and we reverse the grant of summary judgment to Meyer & Associates, Inc. on the issue of breach of contract, finding that genuine issues of material fact still remain on this issue. Based on these reversals, we vacate the March 3, 2014 judgment awarding Meyer & Associates, Inc. $10,603,250.00 in damages and $395,000.00 in reimbursable expenses; and vacate the June 23, 2014 judgment awarding Meyer & Associates, Inc. $5,585,573.00 in attorney fees and $57,662.34 in court costs; and remand the matter to the trial court for further proceedings. Costs of this appeal are assessed to Meyer & Associates, Inc.

**JUDGMENTS REVERSED; VACATED; AND REMANDED.**